May it please the Court. My name is Jeffrey Harrison. Appellants ask this Court to reverse the decision below. I'd like to focus on three points. The de novo standard of review, the District Court's incorrect analysis focused on the proceeding at issue rather than the judicial system in Morocco, and how DeJoria did not meet his burden of proof. The Texas Recognition Act's very low bar for enforcement makes DeJoria's burden a very heavy one, all the more so because DeJoria's preeminent Morocco law expert, Azzedine Ketani, admits, quote, judicial systems in Morocco adhere to international standards. Texas law applies. Under Texas law, the standard of review is de novo. That's the Sanchez v. Palau case, the Redding and Bates case, the Diamond Offshore case. In this Court's 2002 decision in Society of Lloyds v. Turner, this Court applied a summary judgment-like standard to the recognition question and applied de novo review. Due process in Morocco. In Society of Lloyds v. Turner, this Court, approvingly, with the Ashenden Court from the Seventh Circuit, noted that the foreign procedures must only be fundamentally fair and not offend against basic fairness. And this Court emphasized two aspects of the Texas Recognition Act. First, the Act focuses on the foreign country's judicial system rather than the particular proceeding at issue. Second, this Court emphasized that the Act requires only compatibility, not compliance with the traditional rigors of American due process to meet the requirements for enforcement. The District Court acknowledged that the Texas bar sets a very low bar for enforcement, that the Texas Act, under any country that has a history of commitment to the rule of law, will pass the test. The Court then used three cases in particular, and those are featured in Mr. DeGioia's brief here, to try to suggest incompatibility in Morocco. We believe those three cases serve as foils and demonstrate why Morocco's system fully complies with international due process standards, as Mr. DeGioia experts. Well, along that line, the famous Pahlavi opinion upon which DeGioia relies, as I understand it, what is now Maghreb, which at one time was Lone Star, whatever the name was, in which Mr. DeGioia was a shareholder, I believe the Court referred to him as a principal administrator. I believe that's the reference in your brief. What is a, quote, principal administrator in this corporation? A director. All right. That is the evidence here. All right. And this Lone Star was formed in Morocco? Correct. Actually, the Moroccan law controlled the establishment of this corporation in Morocco. Yes. All right. And Mr. DeGioia was in Morocco for the establishment of this corporation? Mr. DeGioia, I believe, made multiple trips to Morocco. I don't know whether he was physically present at the moment of formation. We do know that his signature is on the formation document, the bylaws articles of association. And the corporate headquarters of this corporation is in Rabat, the capital of Morocco? Correct. All right. In the Pahlavi case, Morocco is not like the 1980s post-hostage crisis Iran under the Ayatollah Khomeini's revolution, which was hostile to Americans, hostile to judicial independence, with an openly anti-American government, with a system that did not require actual notice of lawsuits, and where multiple U.S. courts had already found that Americans could not get a fair trial. Our reply brief includes a chart setting forth some of the differences between Morocco in the 21st century and Iran at that time. The Bridgeway v. Citibank case. Morocco is not like 1990s seven-year civil war-torn Liberia, where 200,000 people were killed in that violent civil war. 750,000 fled the country. The judiciary did not function. Legal and judicial protections were almost totally lacking, found the court. There was, quote, little pretense of due process, and corruption was rampant in all government organizations. By contrast, Morocco is at peace. It has a free trade agreement with the United States. It is a long U.S. ally, going back centuries. It has a stable government and economy. Hundreds, perhaps thousands, of international corporations have voted with their feet and do business in Morocco. It is a center for commerce. The Chevron case. Morocco is not like Ecuador, where Chevron proved that President Correa denounced judicial independence, denounced Chevron as an enemy of the court during the litigation, accused Chevron of criminal fraud and tried to foment an investigation, criminally, told the plaintiffs the evidence proved. He would call the judge in that case. Plaintiffs set up a secret checking account. They ghostwrote the independent report, and they ghostwrote the judge's judgment and promised the judge $500,000 to sign it. That is evidence that Chevron developed through its active participation in the Chevron litigation, through the use of lawyers and investigators to try to investigate and develop evidence. Mr. DeGioia had the means to do so and maybe tried, but did not come with any evidence of any impropriety, due process violation, or impartiality here. All he comes with is a story of speculation and innuendo that persuaded the district court. The Chevron case and the 300-page careful opinion by Judge Kaplan out of the Southern District in New York serves as a powerful foil for the absence of evidence here. The only arguably systemic fault that the district court found with Morocco appeared to be the notion that the courts do not have judicial independence. The Recognition Act, of course, does not ask whether the foreign country has an independent judiciary. It asks whether the system provides impartial tribunals or procedures compatible with due process of law. Morocco does have an independent judiciary. Article 82 of Morocco's 1996 Constitution provides, quote, the judiciary shall be independent of the legislative and executive branches. Article 107 of the 2011 Constitution provides, quote, the king is the guarantor of the independence of the judicial power. The king has been a long time, for over a decade, outspoken advocate for judicial independence. None of the country reports or the USAID report on which the district court relied provide that Morocco's system is so partial that litigants cannot get basic fairness. And the evidence of partiality would have to be extreme, like the very few cases where courts have found a failing systemically of due process. Speaking of the reports the court relied upon in its confidential addendum, it references a report. Is that a country report prepared by the State Department? It is a cable sent by an unidentified author copying pieces of news writing from other reports and other newspaper articles. Pure hearsay. It's a State Department cable? Yes. And this was discovered independently by the judge through use of WikiLeaks? It appears so. The court notes that he encountered this piece of evidence in his search. Well, along that line, the judge relies on Federal Rule of Civil Procedure 44.1 determining foreign law as his basis for consulting WikiLeaks. As I read 44.1, it states, a party who intends to raise an issue about a foreign country's law, not a foreign country's legal system. So what is the basis for relying on, 44.1 to give him this power? We think it's improper. 44.1 is focused on law. The judge's independent search was apparently some kind of factual investigation. We think it is improper under 2.9c, not supported under 44.1. And we think that the fact that the judge, though, went outside the record, or at least developed this evidence independently on his own, is an indication that this Court, under the Mattern principle, should revisit the motions panel refusal to take judicial notice of Moroccan law opinions that we submitted. We would ask this Court to take a look at that briefing and reconsider under Mattern. Could you clarify for me procedurally what's happened? Was there a summary judgment motion? There was, I think, a motion for non-recognition. Were they cross motions? Is this a motion ruling? Were there factual findings by the Court? Are we looking at this as an abuse of discretion or de novo procedurally? What kind of ruling do we have from the Court? Is it a ruling on a motion, or was there actually some factual findings of a hearing or trial of some sort? There was no hearing. There was no trial. There were no findings of fact. There was submission on the papers as if a summary judgment. The party's motions were styled motion for non-recognition, cross motion for recognition. They were not styled summary judgment, but they were effectively summary judgment motions. So we had a cross summary judgment, and the ruling is a summary judgment ruling? I think that's the only fair interpretation of it, though, like I say, those words are not used. That was the process and procedure. The parties agreed to that, didn't they? Yes, they did. It's really not a summary judgment, genuine dispute of material fact, is it, basis? This Court's review is de novo. Exactly. Exactly. On the country reports and the lack of evidence of partiality for Morocco, we can't look through a U.S. lens, or we can, but we need to be mindful that we're doing so. Other countries could look at, for example, the judicial system in Texas and find that it is ludicrously partial because it allows parties and litigants with active cases before a judge to give $5,000 each with seven lawyers for DeGioia and himself, that's $40,000 that could be given to a judge. That kind of evidence of partiality is utterly lacking in this case.  neither participated in the trial in Morocco or even had an attorney there to represent him, that he's waived the right to challenge the enforceability of the judgment. But I question the waiver in the light of his claim that it was dangerous to have either a lawyer or himself present for the trial, especially because of claimed interference by the monarchy. So it seems to me that rather than waiver, it just goes to the overall question of whether the Moroccan system is fundamentally fair for want of a better term. I think that Society of Turner certainly goes to that. As to the waiver, though, there is substantial evidence in this record that Mr. DeGioia could have, and in fact did, retain counsel in Morocco, and that should not get traction. First, in 2001, DeGioia's company, Skidmore, a defendant in the Morocco case, retained Azzedine Catani, his current expert here in this proceeding, as his lawyer. We, Maghreb and MFM, tried to hire Mr. Catani as our first choice to bring this case. He declined because he was conflicted. That evidence is in the record and cited in our briefs. DeGioia now, with this litigation on full display, was able to hire Mr. Catani to support at least his reciprocity point, was able to hire Morocco lawyer Tariq Mossadegh to support his jurisdictional point, was able to hire lawyers in Morocco at the Baker McKenzie firm, and we have evidence from Mr. Cabbage, our 35-year Morocco law practitioner, who says it is not necessary, in fact, it is not done in Morocco to have the parties actually attend and participate in proceedings. It's done through lawyers alone, and, says Mr. Cabbage in his expert declaration, lawyers would have been happy to defend Mr. DeGioia in this case. We urged the court to do something the district court did not, and that is please review the detailed declarations of our Morocco law experts, Cabbage and Awad, found at record 1777 and at 1809. There are long, detailed declarations about the Morocco judicial system and its protections. The objective facts disprove the speculation about partiality here. Five of the seven defendants were absolved of any liability. It took seven years to come to judgment. After the court appointed expert Cordale submitted his report, we, appellants, objected to the damages as too low, asked the Moroccan court to allow us to increase damages by effectively $30 million on a lost profits claim, and the court refused to allow an increase in damages and, in fact, awarded $2 million less than what was in Mr. Cordale's report. This is not a rush to justice or a preordain. This is a procedural due process system. DeGioia is not entitled to negative inferences about the king. There were two reasons that the district judge drew these negative inferences, one financial and one reputational. Financially, our briefs identify the notion that the king, for one of 17 prince and princesses, would try to get an extra $15,000... Or $157,000. Thank you. Correct. ...is madness. Reputationally, it is unreasonable to think that because the king announced proudly an apparent oil find 15 years ago that he wants to avoid looking foolish if there's some result where DeGioia is absolved in a case where the king is not a party. That is not a reasonable inference to suggest the king would intervene for several reasons. One is, if we're really thinking about the reputation, the king has been an outspoken advocate for judicial independence and for the adoption of the 2011 Constitution, under which he is the guarantor of judicial independence. If we're thinking about reputation, it is a far greater blow to the king's reputation to intervene in civil litigation than for six instead of five litigants to be absolved. Do you raise your waiver claim in district court? Yes. All right. Last point. Oh, I'm sorry, my time is up. All right, Mr. Harrison, you've got a red light, I think it looks like. Okay. You reserve some rebuttal time. I do. Thank you. Okay. Thank you. We'll hear from Mr. Hurst. Good morning, Your Honors. Mr. Hurst, I find it a bit strange that you're with the Baker McKenzie firm and, as I understand it, your firm has an office in Rabat? We opened that office in 2013, Your Honor. What, do they go there under armed guard every day to report to work? What do you report? Well, I understand it has been a little testy since Judge Allen's judgment came down, yes, Your Honor. But you're still doing business there? We are. But you're here arguing that the system in Morocco is not fundamentally fair. We don't do a litigation practice there. But you have an office there. We do. This is the same country where Mr. DeGioia says it was unsafe to be in the trial and he couldn't even have a lawyer there. But you've got a law firm there, a law firm office. We do. We have offices all over, Your Honor. In fact, I am fond of telling people . . . Do you have one in Iran? No, we do not. Do you have one in Ukraine? We have one in Moscow. We have an office in Caracas, Venezuela. Do you have one in North Korea? No, we do not. Our second office was opened in Venezuela in the 50s, actually. We open offices where it serves our clients, our business clients. As I said, we do not represent clients in the Moroccan courts. Do you have American lawyers in your office in Morocco? No, we do not. Just Moroccan lawyers? That's correct. So you can rely on them? Certainly. Well, they're part of the Moroccan legal system, aren't they? They are Moroccan lawyers representing business interests in Morocco. They are not participating in the judicial system. But they are part of the judicial system. That's my question. Don't you consider lawyers part of the judicial system? To the extent that they are licensed by the state, by the Bar Association, yes. Are they licensed to practice in Morocco? I don't know if they are. If our lawyers in Casablanca, we have, I think, perhaps six. I don't know if our lawyers in Casablanca are admitted to practice in the Moroccan courts. Perhaps that should have been my first answer. All right. Thank you. The irony should not be lost that the appellants would have this court give more deference to the Moroccan judgment than to the very carefully reasoned and factually dense judgment authored by the district court. Relying on WikiLeaks? Well, the district court was careful to segregate the WikiLeaks cable, which was not submitted by either party in the record. That is correct. It was careful to segregate that from the judgment. What's the date of that cable? The date of that cable is 2009, I believe. Judge Nowlin was careful to separate that cable and put it in a separate sealed addendum and to make clear in that addendum that there was more than enough evidence to reach the conclusion he did without the use of the cable. As was also pointed out in our briefing, the cable was in the public domain, and perhaps it's shame on us for not finding it ourselves, but the contents of the cable were cited in at least four places in the record that was before the district court. And, of course, Judge Nowlin said what was in the cable certainly confirmed what he had already concluded, but it was merely cumulative of the evidence that he already had in the record and relied upon. I'd like to address one point that I believe went somewhat astray in the appellant's opening argument, which is the notion that this was a summary judgment proceeding. It absolutely was not. What the parties did is they did have conflicting motions, one for recognition and one for nonrecognition, but it emerged out of discussions of counsel that we would submit an agreed briefing schedule and submit the entire question on the documentary evidence without oral testimony to Judge Nowlin for decision. I believe what happened in the trial court most closely resembles a bench trial on documentary evidence, which is a known and recognized procedure. The standard for review from factual findings arising from such a procedure is that of clear error. Now, as to the court's, other court's use of the de novo standard of review, I believe that has happened in two situations. One is in which a court has clearly identified that the recognition decision hinged on a question of law. That was the case in Redding v. Bates, where it was a question of reciprocity, and the only evidence or the only information the court relied upon was proof of foreign law. The other situation in which this court has applied the de novo standard of review, and this was the case in Society of Lloyds v. Turner, is where the district court made a decision on a summary judgment. This case is neither of those. This case was a bench trial on the documents where both parties waived the right to present oral testimony. I've read the briefs, of course, and I'm just not remembering this was asserted in your brief. It may well have been. They're pretty extensive briefs, but was this raised in your brief? I thought you were relying on it being abuse of discretion. Relying on another case, our court decided for recognition of a judgment in Mississippi. You're exactly correct, Judge Barksdale. We did brief abuse of discretion, but frankly, upon rereading the cases and reflecting on it more carefully, I think the correct approach and the most methodologically sound approach is to review Judge Nowlin's factual findings under the clear error standard. As the court knows, the cases are kind of all over the place on the standard of review. We have both the mandatory and the discretionary grounds for not recognizing a judgment. Courts have looked at the discretionary grounds and said, well, if it's decided under a discretionary ground, then the proper standard of review is abuse of discretion, which leads us with the question, well, what if the judgment was determined not to be conclusive under one of the mandatory grounds, which was the case here? And no court has spoken directly to that question. So to answer your question, Judge Barksdale, reflecting on it, it is clear from so many of this Court's decisions that the de novo standard of review is applied because so many of these cases are decided on a summary judgment basis. This case was not the correct standard to apply, we believe, is clear error, which, of course, is very close to abuse of discretion and its practical impact. We would point out to the court or remind the court simply that this was not, as was suggested in Appellant's opening argument, a matter of the district court gathering proof of foreign law. There are elements of that in the decision, particularly as to the description of the constitutional provisions that make the judiciary dependent upon and answerable to the monarch. However, the great bulk of the district court's judgment is factual findings, and those should be reviewed under the clear error standard and given the deference to which they are entitled. The trial in Morocco, Skidmore was one of the defendants. As I understand it, Skidmore was a corporation for which DiGiorio was a shareholder or director. Yes. That was his original corporation in Texas. That is correct. It's a Texas corporation. That is correct. Did Skidmore participate in the trial? No. Did Skidmore have a lawyer at the trial? No. Did Skidmore participate in the appeal from the trial, which de novo review? No. All right. No, neither Skidmore nor DiGiorio nor anyone affiliated with Mr. DiGiorio appeared or participated in the proceeding in any way, and the notion that they hired counsel who participated in the proceeding on their behalf is totally false and unfounded by the record. Were they aware of the trial or the hearing? Absolutely. They were aware the proceeding was going on, and they made the decision, as they are entitled to do under the Recognition Act, to not go and participate in a show trial for a biased tribunal at potentially risk of their lives or their freedom. They made the decision to stand on their rights under the Texas Recognition Act and challenge the judgment when it was brought to Texas for recognition. Now, the two actions filed in the United States, one in Texas and one in California, and as I understand it, the one filed in Texas resulted in sanctions imposed against Mr. DiGiorio's lawyers for about $500,000. Did you participate in those? To answer your first question, no. We were not counsel in those cases. But to answer something you said behind that, Mr. DiGiorio did not have counsel in either case. He was not a party in either case. And the actions filed in Texas and California? That is correct. Who filed those? I'm sorry? Who filed those actions? Skidmore and Geoscience. And what is Mr. DiGiorio's position in Skidmore? He was a director and a shareholder. I would like to— Is he the majority shareholder in Skidmore? No. What is his percentage of ownership of the shares in Skidmore, as at the time those actions were filed in Texas and California? Your Honor, I believe that Mr. DiGiorio and Mr. Gustin own equal shares. So 50%? I believe so. So actions can be filed for Skidmore in Texas and California without Mr. DiGiorio's approval? I don't know about his approval, but he certainly did not participate. And, in fact, this Court made that exact point in its review of the Texas action that resulted in the sanction that went 75% against Skidmore's outside counsel and 25% against Skidmore and Geoscience. And the only point of appeal, or the point of appeal this Court was asked to address, is why was the sanction imposed against the client and not just the attorney? The question was how involved was the client in the abusive litigation strategy? And this Court, at two places in its opinion, made the point that the client representative who was aware of and apparently approved the litigation strategy was Michael Gustin. It was not John Paul DiGiorio. That is at page 6 of the opinion, footnote 10, and also at pages 6 and 7. Ironically, Mr. Gustin, who also was found liable for this entire judgment by the Moroccan Court, was brought into the proceeding below in the district court. He was brought in as a third-party defendant for purposes of enforcing the judgment against him, yet he was, without explanation, dismissed by the appellants in the district court below, who then proceeded only against Mr. DiGiorio. Was there anything showing that a Texas judgment would not be recognized in Morocco, that Morocco would say the Texas legal system is corrupt, we're not going to recognize those weird Texas judgments? I mean, isn't that part of the way you determine whether Texas, under Texas law, if they don't recognize us, we're not going to recognize them type of simplified situation? Do we have anything that shows that Morocco does not recognize Texas judgments? We do. This is not conclusive in and of itself. There is no evidence that it's ever been done, and certainly not even as to a Texas judgment. The Texas Act, the reciprocity requirement that was specifically adopted by the legislature, says the foreign country must recognize judgments of this state, Texas, not of any of the United States. But the proof that was submitted were two affidavits, one by an attorney in the, one by Professor Catani, who was mentioned by appellants' counsel, and that was the only point for which Catani gave an affidavit, was he said, under Moroccan law, the judges are entitled to consider public policy, and there is no way, there is no assurance that a Moroccan court would recognize the judgment of Texas or any of the United States without looking at the underlying merits. We also had an affidavit. So it depends on the particular case and the judgment, not in general, we will not recognize anything from Texas because of their legal system. Just it depends on the particulars of that particular judgment. That is exactly correct. There is nothing, there is no flat-out prohibition on recognizing judgments from the United States, nor is there any history of it ever having been done, and both Professor Catani and my law partner, Al Abdullah, from the United Arab Emirates, expressed great skepticism that it would be done. And, in fact, their testimony was identical to the testimony that was relied upon by the Northern District of Texas and by this court in the Bank Libanese case, where the proof that a, excuse me, I'm drawing a blank on the country in question. It was one of the United Arab Emirates, Abu Dhabi. In that case, Judge Fitzwater in the Northern District found that Abu Dhabi would not recognize a Texas judgment on the strength of an affidavit from a practitioner in the Arab Emirates who said, it's never been done, but I'm skeptical that it would be done. And that evidence was found sufficient not only by the district court, but by this court in a review under an abuse of discretion standard. The reciprocity and the in personam jurisdiction questions, of course, were not reached by Judge Nowlin. What is the basis for DeGioia saying that in personam jurisdiction is lacking? I assume that's for the underlying action. For the Moroccan action. Yes. He was certainly not served in Morocco. He was never properly served in the United States. Why wasn't he properly served in the United States? In the first instance, the Maghreb and the Mideast Fund for Morocco, the other appellant, came to the Northern District of Texas where they either inadvertently or for some reason misrepresented to Judge Lynn that Mr. DeGioia was a resident of the Northern District in order to obtain issuance of process. That process was issued. It was taken and left with a housekeeper at one of Mr. DeGioia's homes in California, which was not his primary residence. But the effort to serve notwithstanding, once Judge Lynn found out, once it was brought to her attention that Mr. DeGioia did not reside in the Northern District, she quashed the service. Inexplicably, really, the appellants never went, they never did the obvious thing, and went to the Western District of Texas where Mr. DeGioia resides now and where he resided then to have process reissued and served on him there. Their second effort to serve Mr. DeGioia consisted of taking some papers in Arabic. We don't know what they are. They've long since vanished. Putting them in a gift-wrapped box and gaining access to Mr. DeGioia's gated home through the process server misrepresenting himself as bringing a gift from an Austin children's shelter of which Mr. DeGioia is a major benefactor. So they gained access to his home by deceit and trickery and trespass and left him with this gift-wrapped box, and that was their second unsuccessful attempt at service. Now, the articles of incorporation or whatever the term is for the corporation in Morocco in which the corporation consented to actions being tried in Morocco, did that also include waiver of service of process against any individual? And, of course, Mr. DeGioia signed these articles. I know you contend his signature was forged, but what's the provision in the articles about waiver of service? There is no provision about waiver of service. In fact, there is a specific provision for how service will be accomplished, and it involves the appointment of a functionary under the articles of incorporation to be served with any process arising out of such proceeding. Who was the functionary? It never happened because the appellants did not rely on the articles of incorporation in trying to effect service. They tried to effect service first through, I believe it's, I may misspeak, the statutory provision 28 U.S.C. 1696, the process out of the northern district that was quashed, and then the second time around we have no idea what it was other than a bunch of papers in Arabic in a gift-wrapped box, but they did not rely on the procedure set forth in the articles of incorporation to effect service. We ask that the judgment of the district court be affirmed. Thank you. Thank you, Mr. Hurst. We're back to you, Mr. Harrison. How about starting with in personam jurisdiction? Yes. In personam jurisdiction, Mr. Zoria signed as a director and of course was aware as a director that the articles of association of Lone Star provided for consent to jurisdiction over exactly this type of case. That's the first response. The second response is that the Morocco court found at the beginning of its judgment that under Moroccan law Mr. Zoria had been effectively served. Third, Mr. Zoria, though he says the 2003 notice was quashed, that's correct, the 2004 service of process was not quashed, and although in revisionist history in this case the position is taken that that was some kind of criminal trespass, there were no trespass claims brought against the process server in 2004, and to the contrary in the record is Mr. Zoria's sworn affidavit in 2004 where he acknowledges that this process server was, quote, allowed access to the property, end quote. That's record 1752. As to this notion of a curator argument, this means of effecting service through some proxy, our experts explain, and this is in the record, that that is never used in Morocco. Substituted service in Morocco as here is when the location of the actual individual to be served is unknown. There were seven addresses for Mr. Zoria, corporate and multiple homes, and he was served at his primary residence in Austin. He was properly served, and the last point on service is under Moroccan law there is a new clock that starts when served with the judgment. De Zoria does not contest anything about the March 2013 service on him in Austin in person of the actual judgment itself. That gave him a 45-day de novo clock to put in new evidence to try this case, and he did not respond to that either. That itself is effective service. Now, when you say the new evidence and to try this case, that's the de novo appeal. That is correct, sir. In Morocco. Correct. We looked on Baker McKenzie's website. At least two of the six lawyers are admitted to practice in Morocco under the bars of Morocco and Casablanca, Kamal Nasrallah and Adrian Gonzalez Maltese. The district court itself did not say it was making findings of fact. To the contrary, on page 812 of its published opinion, it says, quote, It is neither purely a question of law nor purely a question of fact. Instead, it is a question about the law of a foreign nation. That is the stuff of de novo review, certainly not the stuff of fact finding. Counsel said that you dispute his characterization that this was tantamount to a bench trial as opposed to something akin to the summary judgment vehicle. I do, Chief Judge. This was far more akin to. Indeed, it followed the process of a summary judgment. Indeed, counsel suggested that the parties waive their right to a hearing. That's not correct. The record indicates that Mr. DeGioia's counsel requested a hearing of the court, and the court refused. As to the last point on reciprocity, if I may, there is in the record evidence that Morocco has recognized a $730,000 judgment from the state of New York. That's not Texas, but that's good evidence that Article 430 of the Civil Procedure Code in Morocco, the exequator procedure that allows for the enforcement of due process, is valid. I mean, it doesn't occur all the time, but often it does that the court will ask counsel to prepare proposed findings of fact, conclusion of law, et cetera, in a bench trial or otherwise. My question is just in this scenario, whatever it was, did the district court direct or ask counsel to submit proposed findings of fact or conclusions of law or something similar to that? No, Your Honor, and thank you very much for your time. All right. Thank you to both sides for the briefing and argument.  We learn a lot here, so we'll dig deeply into it and we'll get it decided. This concludes the argued cases we have for this morning. We will take these under.